UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DISTINGUISHED EXECUTIVES
TRANSPORTATION, LLC, and RANDY
FREEMAN,

       Plaintiffs,

v.                         Civil Action No. 2:16-cv-08503

CRACKER BARREL OLD COUNTRY
STORE, INC.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Pending is defendant Cracker Barrel Old Country Store, Inc.'s ("Cracker Barrel") motion for summary judgment, filed December 7, 2017.

### I. Background

Defendant Cracker Barrel is a Tennessee corporation with its principal place of business in Tennessee. (Compl. ¶ 3.) Plaintiff Randy Freeman is an African-American male who resides in Williamsburg, Virginia. (Deposition of Randy Freeman ("Freeman Dep.") 6, 128.) Freeman is the "sole proprietor," as Freeman phrases it, of plaintiff Distinguished Executives Transportation, LLC ("Distinguished Executives"), which is based in Virginia. (Id. 9, 12-13). Distinguished Executives'

business is, in part, contracting with tour companies or churches to transport tour groups via motor coach. (Id. 12-14.)

On September 6, 2015, Freeman, under a contract between Distinguished Executives and White Star Tours, was driving an all-white church group from Elkhardt Baptist Church, which appears to be located in Virginia, to Branson, Missouri. (Id. 14-15, 30, 38, 72.) Freeman stopped the group for the night at a hotel in Cross Lanes, West Virginia. (See id. 38.) While Freeman completed some paperwork, the group proceeded to the adjacent restaurant owned by Cracker Barrel (the "restaurant"). (Id. 30.) Freeman came to the restaurant sometime shortly thereafter. (See id.)

Freeman waited in line at the restaurant for about fifteen minutes until he could be seated. (Id.) He told the wait staff that he was with the group from White Star; he did not mention Distinguished Executives. (Id. 101-03.) As he was being seated, Freeman passed a group of three white women from the group at a table for four. (Id. 30-31; 52; 93.) The women, who had already ordered their food, invited Freeman to sit with them, and Freeman accepted. (Id.) The table's server was Kailee Payne. (See Deposition of Kailee Payne ("Payne Dep.") 30-31.)

According to Freeman, the women's food arrived around thirty minutes later, at which time Freeman asked Payne if he could order. (Freeman Dep. 31.) Freeman alleges that Payne did not respond and left the table. (Id.)

Payne, on the other hand, claims that she asked Freeman soon after he sat down if she could take his order and that Freeman responded that he was not going to eat. (Payne Dep. 31-32.) Payne alleges that Freeman then left the table and that she did not see him for another ten minutes to an hour when he returned to the table. (Id. 33-36.) At that time, Payne asserts that Freeman yelled at her in an aggressive tone, "who's going to take my f--king order?" (Id. 34.) Freeman denies these allegations. (E.g. Freeman Dep. 91.)

Payne left the table and reported her story, in tears, to one of the restaurant's managers, Christopher Goodlet. (E.g. Deposition of Christopher Goodlet ("Goodlet Dep.") 133-35; see Freeman Dep. 31.) Without having seen Freeman, Goodlet claims he decided that Freeman should leave the restaurant. (Goodlet Dep. 146-47, 171.)

Goodlet's testimony indicates that he spoke to Freeman only once, whispering such that no one else could hear. (Id. 132-33.) Goodlet told Freeman what Payne had relayed to him and asked Freeman to leave. (See, e.g., id. 132-33; 140, 147.)

Goodlet claims that Freeman left the table and proceeded to the retail area of the restaurant, (id. 133, 167-68), which is separate from the dining area, (see Freeman Dep. 37). Goodlet avers that Freeman acted rudely in the retail area. (Goodlet Dep. 167-68.) Goodlet claims that he had to get back to work, so he gave Freeman his card and information and asked a different manager, Nate McManaman, to escort Freeman out of the restaurant. (Id. 133, 140, 152, 167-68.) Goodlet's typical response when a customer is unhappy is to ask why and to attempt to resolve the issue. (See id. 124, 128.) In this case, Goodlet believed what Payne had told him without conducting any further investigation. (E.g. id. 159.)

According to Freeman, Goodlet spoke to him twice. Goodlet first informed Freeman of Payne's story but did not ask Freeman to leave. (See Freeman Dep. 31.) Freeman claims that Goodlet spoke loudly enough for the three women to hear, or that the others could at least understand what Goodlet said based on Freeman's response. (Id. 87-92.) Freeman denied that he yelled or cursed at Payne and asserts that he had the support of the three women at the table, and Goodlet left. (Id. 35-36, 41, 87-92.)[1] Freeman alleges that an African-American male replaced

---

[1] For this point, Freeman also proffers three statements, written ostensibly by the three women seated at the table with him. (See Pls.' Ex. C.) The statements, handwritten and not under

4

Payne as the table's server, and Freeman ordered a drink and food. (Id. 36, 80.) The same African-American male brought Freeman his drink. (Id.) Before Freeman received his food, Goodlet returned a second time, told Freeman that he believed Payne, and asked Freeman to leave. (Id. 36-37.) Freeman asked to see a manager and walked to the retail area of the restaurant where he spoke with McManaman. (Id. 36-37.)

McManaman claims that Freeman was being very loud in the retail area and telling other customers to leave the restaurant, (Deposition of Nate McManaman ("McManaman Dep.") 44, 47, 53-54, 58-59), while Freeman avers that he was simply standing in the retail area with a brochure containing the phone number of Cracker Barrel's headquarters, (Freeman Dep. 37). Freeman and McManaman had a brief conversation, and McManaman told Freeman that he had to believe Payne, that Payne was new, that the restaurant was understaffed and busy that day, and that Freeman had to leave. (Id. 37, 80; McManaman Dep. 43-47; 53-56, 58.) McManaman gave Freeman his business card, and Freeman left. (Freeman Dep. 37, 80; McManaman Dep. 46-47, 56.)

---

penalty of perjury, are inadmissible as evidence and played no part in the court's disposition herein. See Fed. R. Civ. P. 56(c)(2).

Freeman later called Cracker Barrel's headquarters about the incident. (Freeman Dep. 39-40.) He received a call back and was told that there would be an investigation, but no one from Cracker Barrel ever contacted him again. (Id.) Goodlet did not write down anything about the incident, nor did he report it to anyone. (Goodlet Dep. 150.)

Neither Goodlet nor Payne felt threatened at any point during the incident. (Id. 168; Payne Dep. 38.) No one yelled at or touched Freeman, and no racial epithets were spoken. (Freeman Dep. 79-80, 121.) Freeman did not seek medical care or incur any medical costs as a result of the incident. (Id. 94-95.) Freeman claims that it was the most embarrassing moment of his life, even moreso than when he attended a racially-segregated elementary school. (Id. 51, 128-29.)

Freeman does not have records of any economic loss suffered by either him or Distinguished Executives as a result of the incident. (Id. 111-13; see id. 14-17.) Additionally, Freeman is unaware of any negative comments made by anyone else about him or by anybody about Distinguished Executives at all. (Id. 98-103, 105.) White Star continues to contract with Distinguished Executives. (Id. 34, 95-96.) Andrew Cammarano, Tour Manager for White Star, swears that White Star took no adverse action against Freeman and Distinguished Executives and

that he "ha[s] not heard of any harm to [Freeman's or Distinguished Executive's] personal or business reputation from an event that occurred at Cracker Barrel." (Affidavit of Andrew Cammarano ¶¶ 1, 3, 7, 9-10.)

Freeman and Distinguished Executives initiated this action in this court on September 1, 2016. The plaintiffs bring three claims against Cracker Barrel, the sole defendant, for discrimination in violation of Section 101 of the Civil Rights Act of 1991, 42 U.S.C. § 1981 (Count I); defamation (Count II); and intentional infliction of emotional distress ("IIED"), also known as the tort of outrage (Count III). The plaintiffs seek, inter alia, damages and injunctive relief. (Compl. WHEREFORE Clause.)

On December 7, 2017, Cracker Barrel moved for summary judgment on all counts. Cracker Barrel argues that Distinguished Executives has failed to show any actions taken against it, (see Mem. Supp. 6, 11), and, further, that Distinguished Executives cannot suffer emotional distress as an entity, (id. 17). As for Freeman, Cracker Barrel insists that there is no evidence that Freeman was removed from the store because he is African-American. (Id. 6-7.) Cracker Barrel also contends that Freeman has failed to establish facts sufficient to sustain his defamation and IIED claims. (Id. 7, 14.)

The plaintiffs argue first that they have established a prima facie case of discrimination and that Cracker Barrel's non-discriminatory justifications for removing Freeman are mere pretext. (Resp. Opp'n 4, 13.) Second, the plaintiffs contend that a reasonable jury could find that Cracker Barrel defamed them. (<u>Id.</u> 13-14.) Third, while the plaintiffs agree that Distinguished Executives cannot suffer IIED, (<u>id.</u> 18), the plaintiffs assert that there exist triable issues pertaining to Freeman, (<u>id.</u> 18-19).

## II. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's review is guided by the principle that it must "construe the evidence, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the nonmoving party." <u>Dash v. Mayweather</u>, 731 F.3d 303, 310 (4th Cir. 2013) (citing <u>PBM Prods., LLC v. Mead Johnson & Co.</u>, 639 F.3d 111, 119 (4th Cir. 2011)).

"As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725 (2nd ed. 1983)).

Regarding genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also S.B. v. Bd. of Educ., 819 F.3d 69, 74 (4th Cir. 2016) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). The moving party has the initial burden of "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). This is true "[i]rrespective of the burdens assigned by the applicable substantive law." Dash, 731 F.3d at 311.

If the movant carries its burden, the non-movant must demonstrate that "there is sufficient evidence favoring [it] for a jury to return a verdict" in its favor. Anderson, 477 U.S. at 249 (citation omitted); see also Dash, 731 F.3d at 311. As explained by our circuit court of appeals,

> [a]lthough the court must draw all justifiable
> inferences in favor of the nonmoving party, the
> nonmoving party must rely on more than conclusory
> allegations, mere speculation, the building of one
> inference upon another, or the mere existence of a
> scintilla of evidence.  <u>See</u> <u>Anderson</u>, 477 U.S. at 252;
> <u>Stone v. Liberty Mut. Ins. Co.</u>, 105 F.3d 188, 191 (4th
> Cir. 1997).  Rather, "a party opposing a properly
> supported motion for summary judgment . . . must 'set
> forth specific facts showing that there is a genuine
> issue for trial.'"  <u>Bouchat v. Balt. Ravens Football
> Club, Inc.</u>, 346 F.3d 514, 522 (4th Cir. 2003) (quoting
> Fed. R. Civ. P. 56(e) (2002) (amended 2010)).

<u>Dash</u>, 731 F.3d at 311 (alteration in original).


### III. Discussion


#### A. 42 U.S.C. § 1981


Section 101 of the Civil Rights Act of 1991, 42 U.S.C.
§ 1981, "protects all persons from racial discrimination in
making and enforcing contracts."  <u>Woods v. City of Greensboro</u>,
855 F.3d 639, 645 (4th Cir. 2017) (citing 42 U.S.C. § 1981).
The statute ensures that "[a]ll persons . . . shall have the
same right . . . to make and enforce contracts . . . as is
enjoyed by white citizens."  42 U.S.C. § 1981 (2016).  "To prove
a § 1981 claim, . . . a plaintiff must ultimately establish both
that the defendant intended to discriminate on the basis of
race, and that the discrimination interfered with a contractual

interest." Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006).

Where a plaintiff cannot produce direct evidence of a defendant's intent to discriminate, the plaintiff "must proffer sufficient circumstantial evidence to satisfy the familiar McDonnell Douglas analytical framework." Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004) (citing Murrell v. The Ocean Mecca Motel, Inc., 262 F.3d 253, 257 (4th Cir. 2001)); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, the burden initially falls upon the plaintiff to establish a prima facie case of discrimination. Williams, 372 F.3d at 667. The burden then shifts to the defendant to "produc[e] evidence that it acted with a legitimate, nondiscriminatory reason." Id. If the defendant carries that burden, the burden then shifts back to the plaintiff to "adduce evidence showing that the defendant's proffered reason was mere pretext and that race was the real reason for the defendant's less favorable treatment of the plaintiff." Id. "Although the respective evidentiary burdens shift back and forth under the framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id. (quoting Tex. Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 253 (1981)).  For reasons explained
below, the court finds that the plaintiffs have demonstrated a
genuine issue for trial as to Freeman, but not as to
Distinguished Executives.

For a section 1981 action "relating to the purchase of
goods or services," as is the case here, a plaintiff's prima
facie case of discrimination is comprised of the following
elements:

> (1) he is a member of a protected class; (2) he sought
> to enter into a contractual relationship with the
> defendant; (3) he met the defendant's ordinary
> requirements to pay for and to receive goods or
> services ordinarily provided by the defendant to other
> similarly situated customers; and (4) he was denied
> the opportunity to contract for goods or services that
> was otherwise afforded to white customers.

Id. at 667-68 (citing Murrell, 262 F.3d at 257).

Contrary to Cracker Barrel's assertion, Distinguished
Executives is a member of a protected class because it has
acquired the African-American identity of Freeman, its sole
proprietor.  In Woods, the United States Court of Appeals for
the Fourth Circuit acknowledged that business entities may,
under certain circumstances, assume a racial identity and thus
possess standing to sue under section 1981 for racial
discrimination.  See 855 F.3d at 645-46.  One such circumstance
endorsed by the Fourth Circuit exists here: where an entity is
"owned entirely by shareholders of a single race."  Id. (quoting

<u>New La. Holdings, LLC v. Arrowsmith</u>, 2012 U.S. Dist. LEXIS
173313, at *19-21 (N.D. Ill. Dec. 4, 2012) (collecting cases)).

Nevertheless, the plaintiffs have failed to adduce
sufficient evidence supporting Distinguished Executives' prima
facie case.  As Cracker Barrel notes, Distinguished Executives
did not attempt to contract with Cracker Barrel.  (<u>See</u> Mem.
Supp. 6.)  Freeman visited the restaurant to purchase a meal for
himself; thus, Freeman is the party who "has (or would have)
rights under the existing (or proposed) contract that he wishes
'to make and enforce.'"  <u>Domino's Pizza, Inc. v. McDonald</u>, 546
U.S. 470, 479-80 (2006); <u>see also</u> <u>id.</u> at 476 ("Any claim brought
under § 1981 . . . must initially identify an impaired
'contractual relationship,' § 1981(b), under which the plaintiff
has rights.")  Indeed, Freeman stated that he was with the White
Star group rather than Distinguished Executives.  Further, there
is no evidence that anyone at the restaurant knew that
Distinguished Executives even existed.

The plaintiffs somewhat confusingly suggest that
Distinguished Executives attempted to contract with Cracker
Barrel because "50% of the cost of a meal [may be] treated as a
business expense."  (Resp. Opp'n 6 (citing I.R.S. Pub. 463
(2016)).)  Section 1981, however, is concerned with intentional
discrimination.  <u>See</u> <u>Denny</u>, 456 F.3d at 434.  The plaintiffs'

reliance upon tax treatment of such an expenditure is unavailing here. Accordingly, Cracker Barrel's motion for summary judgment as to Distinguished Executives is granted.

As to Freeman, on the other hand, the plaintiffs have established a prima facie case of discrimination. Elements one, two, and four are uncontested. Freeman is African-American, a protected class; he sought to purchase a meal from the restaurant owned by Cracker Barrel; and he was removed from the restaurant while the three white customers at his table were not.

Element three - he met Cracker Barrel's ordinary requirements to pay for and to receive goods or services ordinarily provided by Cracker Barrel to other similarly situated customers - is a closer issue, but the evidence, viewed in the light most favorable to Freeman, demonstrates that a reasonable jury could deem it satisfied. As a threshold matter, Cracker Barrel contends that Goodlet did not know Freeman's race when he decided to remove Freeman from the restaurant, that the decision was Goodlet's alone, and that Goodlet was merely acting upon the information conveyed by Payne. (Mem. Supp. 7.) It follows, according to Cracker Barrel, that "there is no evidence that Mr. Freeman was denied service or treated any differently because of his race." (Id.) In other words, Freeman was not an

ordinary customer in the mind of Goodlet because he had apparently cursed and yelled at a server.

The plaintiffs respond that Payne's alleged motivations in reporting her story should be imputed to Goodlet. (See Resp. Opp'n 10.) The plaintiffs rely upon the "causal nexus" theory described by the Sixth Circuit in Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 878 (6th Cir. 2001). According to that theory, the racial animus of a lower-level employee is attributed to the otherwise-colorblind decisionmaker if the "racial animus was the cause of the [adverse action] or somehow influenced the ultimate decisionmaker." Id. at 877.

The plaintiffs note that the evidence, viewed in the light most favorable to Freeman, shows that Freeman did not curse or yell at Payne, leaving "only two distinctions between Freeman and his white counterparts at the table: (1) his race and (2) the false allegation levied against him." (Resp. Opp'n 9-10.) Thus, the plaintiffs argue that a reasonable jury could conclude that Payne "harbored racial animus against Freeman." And because Payne's story was the sole basis for Goodlet's decision to remove Freeman from the restaurant, the plaintiffs insist that Payne's supposed racial animus is imputed to Goodlet. (Id. 10.)

Cracker Barrel replies that "[t]here are several issues with Plaintiffs attempting to apply [Christian] here." (Reply Supp. 5.) First, Cracker Barrel asserts that the plaintiffs' conclusion on Payne's purported racial animus is wholly unsupported by any direct evidence. (See id. 5-6.) The court notes, however, that the McDonnel Douglas analytical framework is driven by circumstantial evidence. See Williams, 372 F.3d at 667. Consequently, a lack of direct evidence of any racial animus harbored by Payne is not fatal to the plaintiffs' argument.

Second, Cracker Barrel argues that the "causal nexus" theory does not exist in the Fourth Circuit. (See Reply Supp. 6-7.) According to Cracker Barrel, the Fourth Circuit endorses a "much stricter" standard that requires the employee harboring racial animus to be a supervisor or a manager. (See id.) Because Payne was neither a supervisor nor a manager, Cracker Barrel contends that any purported racial animus on her part cannot be attributed to Goodlet. (Id. 6.)

In Hill v. Lockheed Martin Logistics Mgmt., the Fourth Circuit declined to adopt the causal nexus theory of the Sixth Circuit as well as similar theories endorsed by other circuits. 354 F.3d 277, 289 (4th Cir. 2004) (en banc) (citing Christian

and other circuit opinions).  Instead, the Fourth Circuit

decided, in an employment dispute, that

> the person allegedly acting pursuant to a
> discriminatory animus need not be the "formal
> decisionmaker" to impose liability upon an employer
> for an adverse employment action, so long as the
> plaintiff presents sufficient evidence to establish
> that the subordinate was the one "principally
> responsible" for, or the "actual decisionmaker"
> behind, the action.

Id. at 288-89 (quoting Reeves, 530 U.S. at 151-52).  Thus,

Cracker Barrel is correct that the Fourth Circuit employs a more

stringent imputed animus standard than its counterparts.  Rather

than a mere causal nexus, as is required in the Sixth Circuit

under Christian, Hill directs "that the subordinate employee

possess[] such authority as to be viewed as the one principally

responsible for the decision or the actual decisionmaker."  Id.

at 291.

Hill, however, does not restrict the racial animus

inquiry only to those with supervisory or managerial authority.

While the operative statutes in Hill - Title VII of the Civil

Rights Act (42 U.S.C. §§ 2000e et seq.) and the Age

Discrimination in Employment Act of 1967 ("ADEA") (29 U.S.C. §§

621 et seq.) - reach only "the acts of its employees holding

supervisory or other actual power to make tangible employment

decisions," Hill, 354 F.3d at 287, the imputed animus standard

in Hill recognizes that the decisions of such employees may be

principally driven or actually made by a discriminating subordinate. Hill acknowledges the practical conclusion that, in these circumstances, the subordinate is fairly regarded as "principally responsible for the decision or the actual decisionmaker" such that he becomes an agent of the employer for purposes of Title VII and the ADEA. See id. at 291. Indeed, the Fourth Circuit noted that holding otherwise "would thwart the very purposes of the acts by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." Id. at 290. And to be sure, the Fourth Circuit in Hill applied the imputed animus standard to a nonsupervisory employee who allegedly harbored discriminatory animus toward the plaintiff, asking whether the nonsupervisory employee could "be deemed a decisionmaker for, or agent of," the employer. See id. at 291.

In any event, the Fourth Circuit's formulation of the imputed animus rule in Hill was rooted in the employment and agency principles underlying Title VII and the ADEA. Section 1981 is not similarly limited. Cf. Patterson v. McLean Credit Union, 491 U.S. 164, 170 (1989) ("The aim of [§ 1981] is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."). In particular, in a case relating to the

purchase of goods or services, "it is rare that . . . a consumer will be mistreated by a manager or supervisor. Most consumer encounters are between consumers and clerks who are non-supervisory employees." Arguello v. Conoco, Inc., 207 F.3d 803, 810 (5th Cir.), cert. denied, 531 U.S. 874 (2000). "[A] rule that only actions by supervisors are imputed to the employer would result, in most cases, in a no liability rule." Id.

For these reasons, while the imputed animus rule of Hill may, in a given employment situation, require that the employee harboring discriminatory animus be a supervisor or manager, section 1981 seems to require that the imputed animus rule be modified for cases relating to the purchase of goods or services. Accordingly, Cracker Barrel's argument that Payne's alleged racial animus cannot be imputed to Goodlet because Payne had no supervisory authority is without merit.

Viewed in the light most favorable to Freeman, the record reveals the following account. Freeman sat with three white women from the group at a table of four. Around thirty minutes later, the women's food arrived. Freeman asked the table's server, Payne, if he could order. Payne did not respond and went to a separate area of the restaurant to speak with Goodlet, a manager. There, a crying Payne recounted a false story that Freeman had cursed and yelled at her. A reasonable

jury could conclude that Payne's conduct was motivated by racial
animus: as the plaintiffs note, "[Payne] knew nothing else about
Freeman but his race." (Resp. Opp'n 10.) If Goodlet decided,
based solely on Payne's demeanor and story, and without knowing
that Freeman was African-American, that Freeman had to leave the
restaurant, Payne was thus the actual decisionmaker, and the
inference of her racial animus can be imputed to Goodlet.

        Goodlet then told Freeman the story that Payne had
relayed, speaking loudly enough that the women at Freeman's
table could hear. Freeman denied that Payne's story was true,
and Goodlet left the table without asking Freeman to leave the
restaurant. Goodlet then replaced Payne with an African-
American male as the table's server who provided Freeman with a
requested drink. Sometime later, before Freeman's food arrived,
Goodlet returned to the table and asked Freeman to leave.
Freeman asked to see a manager and walked to the retail area of
the restaurant. Ultimately, McManaman told Freeman that Freeman
had to leave, stating that he had to believe Payne, that Payne
was new, and that the restaurant was busy and understaffed that
day.

        From that account, the court concludes that the
plaintiffs have thereby satisfied element three of the prima
facie case in regards to Freeman. A reasonable jury could

decide that Freeman, as a customer, was no different than any ordinary customer at the restaurant: he was seated and simply asked whether he could order a meal.  See, e.g., Williams, 372 F.3d at 668 (finding that a plaintiff established a prima facie case under comparable circumstances); Christian, 252 F.3d at 878-79 (same); Lloyd v. Waffle House, Inc., 347 F. Supp. 2d 249, 254 (W.D.N.C. 2004) (same); Slocumb v. Waffle House, Inc., 365 F. Supp. 2d 1332, 1339-40 (N.D. Ga. 2005) (same).

The burden now shifts to Cracker Barrel to justify its actions with a legitimate, nondiscriminatory reason.  Cracker Barrel proffers that Goodlet was simply acting upon the information given to him by Payne and did not know Freeman's race when he decided to remove Freeman from the restaurant. (Mem. Supp. 7.)  Cracker Barrel also contends that some measure of hostility is simply indicative of "another example of the decline of civility," particularly in light of Payne's inexperience and the restaurant being busy and understaffed. (See Mem. Supp. 5-7 (quoting Lizardo v. Denny's, Inc., 270 F.3d 94, 102 (2d Cir. 2001)).)  "[The court] assume[s], without deciding, that this evidence suffices as a legitimate, nondiscriminatory reason for" removing Freeman from the restaurant.  Williams, 372 F.3d at 669 (citing, as an example, Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000));

cf. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it can involve no credibility assessment." (quotation marks omitted)).

Cracker Barrel having carried its burden, the plaintiffs must demonstrate evidence such that a reasonable jury could conclude by a preponderance of the evidence that Cracker Barrel's proffered legitimate, nondiscriminatory reason is mere pretext for racial discrimination. See id. At this step, the Fourth Circuit advises as follows:

> Even though the presumption of discrimination created by the prima facie case no longer exists, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case, and the reasonable inferences drawn therefrom, in determining whether the defendant's proffered explanation is pretextual and whether the defendant in fact unlawfully discriminated. In some cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated."

Id. (citation omitted) (citing and quoting Reeves, 530 U.S. at 143, 147-48); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

The plaintiffs argue that "Cracker Barrel's decision to eject Freeman absent any investigation, let alone a reasonable one, means that [Goodlet's] assertion that he did not consider race in ejecting Freeman was a mere pretext to discrimination." (Resp. Opp'n 13.) The plaintiffs reference Cracker Barrel's threats of violence policy, which is inapposite here as there are no allegations of threats of violence. (<u>See</u> Pls.' Ex. F.)

The court concludes that a reasonable jury could find that Cracker Barrel's proffered reasons are pretextual. Beginning with Goodlet's apparent ignorance of Freeman's race when he decided to remove Freeman from the restaurant, the court has already decided that Payne's alleged racial animus can be imputed to Goodlet. Further, there is reason to believe that this reason is false. Viewed in the light most favorable to Freeman, Goodlet did not ask Freeman to leave when the two first spoke. Goodlet merely relayed Payne's story, which Freeman denied. Instead of attempting to remedy the situation, as Goodlet testified he normally would do when a customer is unsatisfied, Goodlet sent an African-American server to Freeman's table. Nevertheless, after having spoken to Freeman and doubtlessly learning Freeman's race, Goodlet spoke to Freeman a second time and asked Freeman to leave.

Cracker Barrel's remaining reasons are also insufficient at this stage. A reasonable jury could be hesitant to chalk racial animus up to yet another decline in civility. Moreover, the record shows that Cracker Barrel was able to counter Payne's inexperience with a different server, who was evidently able to serve Freeman's table despite staffing shortages and business traffic issues.

Accordingly, the plaintiffs have demonstrated genuine issues for trial as to Freeman's, but not Distinguished Executives', claim of racial discrimination under 42 U.S.C. § 1981.

B. Defamation

In West Virginia, "[t]he essential elements" of a defamation action brought by a private individual are as follows:

> (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury.

Syl. Pt. 5, Belcher v. Wal-Mart Stores, 211 W. Va. 712 (2002) (quoting Syl. Pt. 1, Crump v. Beckley Newspapers, 173 W. Va. 699 (1983)). As a general matter, a sufficient showing on each element of a cause of action is necessary to survive summary

judgment.  See id. at 719 (citing Syl. Pt. 2, Williams v.
Precision Coil, Inc., 194 W. Va. 52 (1995)).

Beginning with Distinguished Executives, no reasonable
jury could conclude that Cracker Barrel defamed Distinguished
Executives.  The plaintiffs evidently do not disagree, as the
response brief does not address Distinguished Executives'
defamation claim.  (See Resp. Opp'n 13-18.)  There is no
evidence in the record demonstrating any statement in reference
to Distinguished Executives.  As earlier noted, Freeman never
mentioned Distinguished Executives, instead stating that he was
with the White Star group, and there is nothing in the record to
show that anyone at the restaurant had any knowledge of
Distinguished Executives.  Accordingly, Cracker Barrel's motion
for summary judgment regarding Distinguished Executives is
granted.

Turning to Freeman, the court finds that Freeman's
defamation claim fails because the record does not demonstrate
that he suffered special damages.  The plaintiffs put forth two
allegedly defamatory communications: Goodlet's accusation that
Freeman yelled and directed the word "f--king" at his server and
Freeman's removal from the restaurant.  (See Resp. Opp'n 14-15.)
The plaintiffs insist that both communications injured Freeman
per se and per quod.  (Id. 13-14, 18.)

There are two types of defamatory communications: libel and slander. See Restatement (Second) of Torts § 568 (Am. Law Inst. 1977); see also Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 519 (2d ed.). Libel is defamation by writing or comparable means, while slander is defamation by any other means, including oral words and physical gestures. Restatement (Second) of Torts § 568; The Law of Torts § 519; cf. Syl. Pt. 3, Crump, 173 W. Va. 699 ("Although libel is generally perpetrated by written communication, it also includes defamation through the publication of pictures or photographs."); Syl. Pt. 4, id. ("Defamation may be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference.").

Slander, at issue here, is further divided into two categories based upon the nature of the communication. General slander, or slander per quod, requires proof of special damages, or pecuniary loss. The Law of Torts, § 534. Slander per se, on the other hand, comprises a limited set of slanderous communications that are regarded as so severe that proof of special damages is not required. See id.; 50 Am. Jur. 2d Libel and Slander § 145 (2018) (describing slanderous per se communications as those that naturally "tend to disgrace or degrade the plaintiff, or to hold him up to public hatred,

contempt, or ridicule, or to cause him to be shunned or avoided, or to directly prejudice or injure him in his business by imputing to him a want of fitness for engaging therein"); cf. Denoff v. Fama, 102 W. Va. 494, 504 (1926) ("Where words are actionable per se, it is not necessary to aver and prove special damages in order to entitle the plaintiff to general damages. The law implies all such damages as are the natural and probable consequence of the words so spoken or written, in all cases where the words are actionable per se.") (quoting Syl. Pt. 2, Milan v. Long, 78 W. Va. 102 (1916)).

> Slander per se is that which charges a (1) serious criminal offense or one of moral turpitude, (2) a "loathsome" and communicable disease, (3) any matter incompatible with business, trade, profession, or office, and, sometimes, (4) serious sexual misconduct.

The Law of Torts § 534 (footnotes omitted) (citing, inter alia, Restatement (Second) of Torts §§ 571-73); see also Restatement (Second) of Torts §§ 570, 574; 50 Am. Jur. 2d Libel and Slander § 145 (2018); 12A M.J. Libel and Slander § 3 (2018). The determination of whether a communication constitutes slander per quod or slander per se is a question of law. See 50 Am. Jur. 2d Libel and Slander § 144; 12A M.J. Libel and Slander § 3 n.404; cf. Belcher, 211 W. Va. at 719 (stating that "[a] court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory

meaning" (quoting Syl. Pt. 6, <u>Long v. Egnor</u>, 176 W. Va. 628 (1986))).

The plaintiffs argue that Cracker Barrel slandered Freeman per se by charging him with the "crime of disorderly conduct or trespass." (<u>See</u> Resp. Opp'n 15, 18.) For a charge of criminal conduct to be actionable without proof of special damages, the relevant criminal offense must, "if committed in the place of publication, . . . be (a) punishable by imprisonment in a state or federal institution, or (b) regarded by public opinion as involving moral turpitude." Restatement (Second) of Torts § 571. Many misdemeanors, even though "punishable by imprisonment in the county jail," are not actionable per se under subsection (a) and must otherwise be one of moral turpitude. <u>See</u> <u>id.</u> cmt. f. Moral turpitude contemplates "inherent baseness or vileness of principle in the human heart," or "shameful wickedness, so extreme a departure from ordinary standards of honesty, good morals, justice or ethics as to be shocking to the moral sense of the community." <u>Id.</u> cmt. g.

In West Virginia, disorderly conduct and trespass are misdemeanors, and only disorderly conduct carries a potential penalty of "confine[ment] in jail for twenty-four hours." <u>See</u> W. Va. Code Ann. §§ 61-3B-2 (trespass), 61-6-1b (disorderly

conduct) (West 2018, eff. 1978 and June 9, 2015, respectively).
Thus, assuming arguendo that Goodlet charged Freeman with those
two misdemeanors, a point which the court finds tenuous, neither
are slander per se under subsection (a).  Moreover, neither can
reasonably be classified as involving moral turpitude under the
above definitions.

        The plaintiffs also contend that Cracker Barrel's
alleged slander of Freeman is actionable per se as a charge of
matter incompatible with Freeman's business.  (See Resp. Opp'n
18.)  Any such imputation "must affect the plaintiff in some way
that is peculiarly harmful to one engaged in his trade or
profession."  Restatement (Second) of Torts § 573 cmt. e; see
also id. cmt. c; The Law of Torts § 534.  "Disparagement of a
general character, equally discreditable to all persons, is not
enough unless the particular quality disparaged is of such a
character that it is peculiarly valuable in the plaintiff's
business or profession."  Restatement (Second) of Torts § 573
cmt. e.  The alleged defamatory communications at issue here
have no direct relevance to Freeman's business; rather, they are
general disparagements that would equally discredit any person.
Consequently, the court finds that the alleged defamatory
communications fall under slander per quod, and the plaintiffs
must proffer some proof of special damages.

On that note, the plaintiffs have not demonstrated
that Freeman has suffered any pecuniary loss as a result of
Cracker Barrel's alleged conduct.  Freeman does not have any
record of economic loss as a result of the incident, and the
incident does not appear to have negatively affected Freeman's
business.  Indeed, White Star continues to contract with
Distinguished Executives.  Accordingly, because the plaintiffs
have not shown that Freeman has suffered pecuniary loss, Cracker
Barrel's motion for summary judgment on Freeman's defamation
claim is granted.

C. Intentional Infliction of Emotional Distress

A plaintiff must establish the following four elements
to prevail on a claim of IIED:

> (1) that the defendant's conduct was atrocious,
> intolerable, and so extreme and outrageous as to
> exceed the bounds of decency; (2) that the defendant
> acted with the intent to inflict emotional distress,
> or acted recklessly when it was certain or
> substantially certain emotional distress would result
> from his conduct; (3) that the actions of the
> defendant caused the plaintiff to suffer emotional
> distress; and, (4) that the emotional distress
> suffered by the plaintiff was so severe that no
> reasonable person could be expected to endure it.

Syl. Pt. 3, Travis v. Alcon Labs., Inc., 202 W. Va. 369 (1998).

"Whether conduct may reasonably be considered outrageous is a

legal question, and whether conduct is in fact outrageous is a question for jury determination."  Syl. Pt. 4, id.

Under West Virginia common law, a defendant's conduct gives rise to IIED

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Tanner v. Rite Aid, 194 W. Va. 643, 651 (1995) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  The Supreme Court of Appeals cautions that "[e]specially where no physical injury accompanies the wrong, the tort of outrage is a slippery beast, which can easily get out of hand without firm judicial oversight."  Id. (quoting Keyes v. Keyes, 182 W. Va. 802, 805 (1990)).

At the outset, the plaintiffs "agree that [Distinguished Executives] cannot bring a cause of action for" IIED.  (Resp. Opp'n 18.)  Accordingly, Cracker Barrel's motion for summary judgment as to Distinguished Executives' IIED claim is granted.

Turning to Freeman, viewed in the light most favorable to him, the record does not demonstrate conduct so outrageous as

31

to give rise to a claim for IIED.  Goodlet accused Freeman of
cursing and yelling at his server, which could have been
overheard by the three women seated with Freeman.  Later,
Goodlet returned to the table and asked Freeman to leave.
Freeman then walked with Goodlet to the retail area of the
restaurant, where McManaman affirmed that Freeman had to leave
the restaurant.  These events, while establishing a triable
section 1981 issue when combined with other factors evincing
intentional discrimination, do not "go beyond all possible
bounds of decency."

The plaintiffs contend that Cracker Barrel's conduct
was tantamount to "falsely accus[ing] Freeman of a criminal act
severe enough to warrant him a personal escort out of the
[restaurant]," and that doing so constitutes outrageous conduct
in West Virginia.  (See Resp. Opp'n 19.)  The plaintiffs liken
the present circumstances to Tanner, wherein the Supreme Court
of Appeals affirmed a lower court's decision that a jury could
properly evaluate the evidence without the aid of expert
testimony.  194 W. Va. at 655.  In that case, the plaintiffs,
"inter alia, (1) were publicly accused of criminal wrongdoing,
(2) endured a lengthy, humiliating public search of their
persons and belongings, (3) were repeatedly labeled as thieves,
and (4) were ridiculed by onlooking customers."  Id.  The

Supreme Court of Appeals concluded that the jury, in finding the defendant liable for IIED, did not need expert testimony "to prove causation or severity of distress in these circumstances." Id.

Despite the apparently limited holding in Tanner, Freeman was not subjected to a level of conduct comparable to the plaintiffs in that case. There, the defendant's employees physically accosted the plaintiffs; loudly, angrily, and explicitly accused the plaintiffs of theft; and forcefully searched the plaintiffs' belongings and persons. See id. at 646-48. The incident occurred over a continuous "twenty to thirty minutes" and adjacent to a number of other customers. See id. at 648. The plaintiffs here attempt to shoehorn in implicit accusations of criminality, (see Resp. Opp'n 19), but the court finds that assertion tenuous at best as noted earlier. Regardless, missing from the present circumstances is any alleged conduct by Cracker Barrel that could arguably be considered outrageous. Cracker Barrel's motion for summary judgment on Freeman's IIED claim is granted.

IV. Conclusion

Accordingly for the foregoing reasons, it is ORDERED that Cracker Barrel's motion for summary judgment be, and hereby

is, granted in part and denied in part as fully described
herein.  Specifically, Cracker Barrel's motion for summary
judgment is granted on each of Distinguished Executives' claims;
granted on Freeman's claims of defamation and IIED; and denied
on Freeman's section 1981 claim.

The Clerk is directed to transmit copies of this
memorandum opinion and order to all counsel of record and to any
unrepresented parties.

ENTER: May 10, 2018

John T. Copenhaver, Jr.
United States District Judge